FILED

June 4, 2015

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time: 7:57 AM



## COURT OF WORKERS' COMPENSATION CLAIMS
## DIVISION OF WORKERS' COMPENSATION

| | | |
|---|---|---|
| Artie Pierce, | ) | DOCKET #: 2014-05-0034 |
| Employee, | ) | STATE FILE #: 90713/2014 |
| v. | ) | DATE OF INJURY: September 25, 2014 |
| Metro Industrial, | ) | Chief Judge Switzer |
| Employer, | ) | |
| and, | ) | |
| Star Net/Key Risk | ) | |
| Management Services, LLC, | ) | |
| Carrier/TPA. | ) | |

## EXPEDITED HEARING ORDER

THIS CAUSE came before the undersigned Workers' Compensation Judge on May 19, 2015, upon the Request for Expedited Hearing filed by Employee, Artie Pierce, on January 7, 2015, with the Tennessee Court of Workers' Compensation Claims, Division of Workers' Compensation, pursuant to Tennessee Code Annotated section 50-6-239 to determine if Employer, Metro Industrial (Metro), is obligated to continue medical benefits and initiate past and ongoing temporary partial disability benefits. Considering the positions of the parties, the applicable law and all of the evidence submitted, the Court finds that Mr. Pierce is entitled to the requested benefits at this time.

## ANALYSIS

### Issues

1. *Whether Mr. Pierce sustained an injury that arose primarily out of and in the course and scope of employment with Metro;*

2. *Whether Employee is entitled to an evaluation by another physician; and,*

3. *Whether Employee is entitled to any past or future temporary total disability (TTD) benefits[1].*

---

[1] The DCN listed the adequacy of Mr. Pierce's notice of injury to Metro as an additional issue. Metro withdrew the notice issue at the Expedited Hearing.

1

**Evidence Submitted**

The Court admitted the following documents into evidence:

Ex. 1: Medical records of Artie Pierce
  - o      Complete Express Care
  - o      Tennessee Orthopaedic Alliance

Ex. 2: Affidavit of Artie Pierce, with six (6) Attachments

Ex. 3: Affidavit of Thomas Ashe, Jr.

Ex. 4: Three (3) First Reports of Injury

Ex. 5: E-mail from Yulanda Tate to J.J. Moye, et. al, Metro Industrial, Oct. 13, 2014

Ex. 6: E-mail from Larry Clark, Tepro, to Debbie Faulkner, Tepro, Oct. 15, 2014

Ex. 7: Metro Industrial Questionnaire, completed by Britney Robinson.

The Court designated the documents below as the technical record:

- Petition for Benefit Determination, December 4, 2014
- Dispute Certification Notice, January 7, 2015
- Request for Expedited Hearing, January 7, 2015
- Metro's Witness List, May 15, 2015.

The Court considered any facts asserted within these pleadings as allegations unless substantiated by evidence presented at the hearing.

The following witnesses provided in-person testimony: Mr. Pierce and Ms. Robinson.

The parties stipulated to the following facts:

1. Mr. Pierce's compensation rate is $277.09.
2. The date of injury is September 25, 2014.
3. Metro offered a panel on November 6, 2014, from which Mr. Pierce chose Complete Express Care as his authorized treating provider.
4. Dr. James Rungee saw Mr. Pierce on December 4, 2014, at which time Dr. Rungee ordered Mr. Pierce to undergo a functional capacity evaluation (FCE).
5. Mr. Pierce has not worked since October 10, 2014.

**History of Claim**

Mr. Pierce is a thirty-eight (38) year-old resident of Franklin County, Tennessee. He worked for Metro Industrial, a staffing agency, which assigned him to Tepro, Inc.

Mr. Pierce testified that, on September 25, 2014, he worked in Department L42L, packing parts. Mr. Pierce testified that, at 4:25 a.m., he grabbed an armful of parts and placed them on his shoulder. As he turned, twisted and took a couple of steps, a sign fell over on him, pulling him backward. The sign made contact with the left side of his back, hip and shoulder. It pushed him into a crate, injuring Mr. Pierce's left arm and back. He gave immediate verbal notice of the injury. Thomas Ashe, a co-worker, testified in his affidavit (Ex. 3), in relevant part: "On the 25[th], the sign displaying SOP[2] fell over due to parts being place (sic) on it and fell into Artie Pierce knocking him back and causing him to hit his back and elbow on the finish crate of parts."

Mr. Pierce testified that, over the coming days, he continued to work despite experiencing pain and waited for Metro to provide him with paperwork that would enable him to seek medical care. On October 10, 2014, he left work after 1.75 hours (Ex. 2, Attach. 1). He claims that e-mails dated October 13, 2014, and October 15, 2014, which were circulated between staff at Metro and Tepro, confirm that he remained employed with Metro after that date because they do not mention his termination[3] (Ex. 2, Attachs. 2 and 3, and Exs. 5 and 6). Mr. Pierce completed a statement on November 6, 2014, where he listed three witnesses to the accident (Ex. 2, Attach. 6). However, Metro's Questionnaire, completed by Ms. Robinson, asks whether there are any witnesses, to which she wrote, "N/A" (Ex. 2, Attach. 1; Ex. 7). The Questionnaire additionally asks if light-duty work is available, to which Ms. Robinson wrote, "N/A." *Id.*

On cross-examination, Mr. Pierce reviewed a recap of his hours worked from September 16 through October 10, 2014 (Ex. 2, Attach. 2). Mr. Pierce testified that he worked all of his scheduled hours from the date of injury, September 25, 2014, until October 10, 2014. Mr. Pierce stated that he is aware of Metro's "no-call/no-show" policy, as well as its point system for attendance. Mr. Pierce said that he told two Tepro employees that he was leaving on October 10, 2014. Those employees stated they would inform Metro. Mr. Pierce testified that, after Friday, October 10, 2014, he contacted a Metro employee, Yulanda Tate, on the following workday, Monday, October 13, 2014, to tell her that he would not be able to work that day. Her response was "OK," and that she would speak to Larry Clark and Ms. Robinson in Human Resources about the situation. Mr. Pierce did not hear back from her, nor did anyone else from Metro follow up with him.

Ms. Robinson is branch manager for Metro. Her duties include oversight of human resources and workers' compensation matters. Ms. Robinson testified that she received the e-mail from Ms. Tate on Monday, October 13, 2014 (Ex. 5), which was the first notice she received regarding Mr. Pierce's injury. She testified that she realized Mr. Pierce was no longer at Tepro on October 13, 2014, when she pulled his timecard and saw that his last day

---

[2] Mr. Pierce explained during his testimony that "SOP" is an acronym for "Standard Operating Procedures."

[3] Although Mr. Pierce made this statement during his testimony, the Court considers it as argument.

worked was October 10, 2014. She proceeded to investigate the injury. On October 16, 2014, Debbie Faulkner from Tepro forwarded an e-mail to her and others about the injury (Ex. 2, Attach. 3; Ex. 6). Ms. Robinson said that Tepro has a policy that an accident report must be completed on the same day that an injury is reported, and that Mr. Pierce did not provide an accident report.

Ms. Robinson testified that she completed the Metro Industrial Questionnaire on November 6, 2014 (Ex. 2, Attach. 1; Ex. 7). With regard to question #13, which inquires about the availability of light duty, Ms. Robinson testified that she wrote "N/A" because at that time, she did not know Mr. Pierce's restrictions since Mr. Pierce had yet to see a doctor. Concerning question #14's inquiry about "lost time," she testified that Mr. Pierce missed work on Saturday and Sunday, September 27 and 28, 2014, when he was scheduled to work. However, if they were "short-staffed" or "did not have enough numbers," he might not have had to work those two days. She later testified that these "missed" days were insignificant. The Questionnaire additionally states, at the bottom of the page, "VERY QUESTIONABLE CLAIM!!" (emphasis in original). Ms. Robinson testified that Metro would have had a job within the restrictions that Mr. Pierce provided on November 6, 2014.

The no-call/no-show policy requires Metro employees to call in twenty-four to forty-eight (24-48) hours in advance of expected absences. Three (3) no-call/no-shows are grounds for automatic termination. Regarding application of this policy to Mr. Pierce, Ms. Robinson explained that he received two no-call/no-show points for his absences on Saturday and Sunday, October 11 and 12, 2014. Friday, October 10, 2014 – the day he worked 1.75 hours – also counted as a no-call/no-show. Metro's policy is to use the last date an employee was at the workplace as the date of termination, regardless of whether the decision to terminate is made after that date.

On cross-examination, Ms. Robinson said that Tepro has some departments that work seven days per week. Regarding L42L working on Saturday and Sunday, October 11 and 12, 2014, she testified that, "I heard that that department did work that day. We do have on-sites who tell us when those people work." She said that, even if it was not on the schedule board that employees must work, if they do not call in, Metro considers that failure a no-call/no-show. Regarding the decision to terminate Mr. Pierce after October 15, 2014, when he gave notice, she stated:

> We were notified that it was not recordable, as you would say, which means that they don't know if it was on the record or off the record. So, as the employee – employer – we've got from HR, yes, we have to terminate you. Because at that time, they do not know if you were happened (sic) at work or somewhere else. So, at that time, yes, we had to let you go.

4

Ms. Robinson agreed that she began her investigation on Monday, October 13, 2014.

On November 6, 2014, Metro offered a panel, from which Mr. Pierce chose Complete Express Care as his authorized treating provider (*See generally,* Ex. 1, pp. 2-8). Karen Chiu, APN, placed restrictions of "no lifting, pinching, twisting, carrying with left hand for one week. Also no lifting due to back," and, "No lifting greater than 15 [fifteen] pounds for a week." *Id.*

Mr. Pierce received authorized care from Dr. James Rungee of Tennessee Orthopaedic Alliance on December 4, 2014 (*See generally,* Ex. 1, pp. 9-14). A case manager also attended the appointment (Ex. 1, p. 9). Dr. Rungee ordered an FCE and placed Mr. Pierce on lifting restrictions of no more than ten (10) pounds "until we see him back" (Ex. 1, p. 11). According to Mr. Pierce, he attempted the FCE, but was unable to perform it due to high blood pressure. Mr. Pierce testified that the carrier declined to pay for a physician to examine him and potentially clear him to undergo the FCE. He has not seen a physician for this purpose out of his own pocket because his truck was repossessed, he sold his grandfather's ring and he is behind on his mortgage. Mr. Pierce further testified that, after receiving restrictions from Complete Express Care and Dr. Rungee, he gave copies of the restrictions to Ms. Robinson. Since he has not completed the FCE, he has not returned to Dr. Rungee.

### Mr. Pierce's Contentions

Mr. Pierce asserts that he sustained an injury that arose primarily out of and in the course and scope of employment with Metro. Metro should be liable for the expenses of the blood pressure evaluation and any treatments associated with it to permit him to perform the FCE. Mr. Pierce additionally contends he is entitled to past and continuing disability benefits. Because Metro wrongfully terminated him, he is eligible for temporary disability benefits.

### Metro's Contentions

Metro asserts that Mr. Pierce violated its attendance policy and its October 10, 2014 termination was for cause under the no-call/no-show policy. Therefore, Mr. Pierce is not eligible for past temporary partial disability benefits. Longstanding, binding caselaw and persuasive authority – in particular, the trial court's opinion in *Ricketts v. Dana*, No. 2014-07-0024 (Tenn. Ct. Workers' Comp. Claims, March 23, 2015) – support its position.

## Findings of Fact and Conclusions of Law

*Standard Applied*

The Workers' Compensation Law shall not be remedially or liberally construed in favor of either party but shall be construed fairly, impartially, and in accordance with basic principles of statutory construction favoring neither the employee nor employer. Tenn. Code Ann. § 50-6-116 (2014). Tennessee Code Annotated section 50-6-239(c)(6) provides that, "[u]nless the statute provides for a different standard of proof, at a hearing the employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence." Tenn. Code Ann. § 50-6-239(c) (2014). A different standard of proof exists for the issuance of interlocutory orders at expedited hearings than the standard of proof required at compensation hearings. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063 (Tenn. Work. Comp. App. Bd., March 27, 2015). A workers' compensation judge may enter an interlocutory order for medical or temporary benefits upon a determination that the injured employee would likely prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1) (2014); *cf. McCall v. Nat'l Health Care Corp.*, 100 S.W.3d 209, 214 (Tenn. 2003).

*Factual Findings*

On September 25, 2014, Mr. Pierce sustained an injury by accident arising primarily out of and in the course and scope of his employment. Metro's termination of Mr. Pierce was improper under its standards. Mr. Pierce received authorized medical treatment for the injury on November 6, 2014, and December 4, 2014. Dr. Rungee recommended an FCE, which Mr. Pierce was unable to perform due to his hypertension. Mr. Pierce must obtain clearance from a family practitioner regarding his blood pressure to perform the FCE.

*Application of Law to Facts*

*Mr. Pierce sustained an injury that arose primarily out of and in the course and scope of his employment with Metro.*

The Workers' Compensation Law defines "injury" and "personal injury" to mean an injury by accident "arising primarily out of and in the course and scope of employment ... ." Tenn. Code Ann. § 50-6-102(13)(A) (2014). An injury is "accidental" only if the injury is caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence[.] *Id.* An injury "arises primarily out of and in the course and scope of employment" only if it has been shown "by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes[.]" Tenn. Code Ann. § 50-6-102(13)(B) (2014).

6

The Tennessee Supreme Court has consistently held that, in order to qualify as a compensable workers' compensation claim, an injury must both "arise out of" and occur "in the course of" employment:

> The phrase "in the course of" refers to time, place, and circumstances, and "arising out of" refers to cause or origin. "[A]n injury by accident to an employee is in the course of employment if it occurred while he was performing a duty he was employed to do; and it is an injury arising out of employment if caused by a hazard incident to such employment." Generally, an injury arises out of and is in the course and scope of employment if it has a rational connection to the work and occurs while the employee is engaged in the duties of his employment.

*Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 638, 643 (Tenn. 2008) (quoting *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991)).

In this case, Mr. Pierce credibly testified that, on September 25, 2014, while working at Tepro, he grabbed an armful of parts and turned when a sign fell on him, pushing him into a crate and injuring his left arm and back. He offered sufficient detail of the circumstances of the accident, including the time, 4:25 a.m., and place, Department L42L. The accident occurred while Mr. Pierce was performing a duty he was employed to do: pack parts. The injury arose out of his employment because a sign describing how employees are to perform their work accidentally falling on an employee is a hazard incident to employment in the manufacturing setting. Moreover, a rational connection exists between the type of accident he described and Mr. Pierce's workplace, and it occurred while Mr. Pierce was engaged in his duties of employment. Mr. Ashe's account of the accident in his affidavit substantiates Mr. Pierce's version of the injury. Further, Metro offered no countervailing proof of Mr. Pierce's description of the accident. At this interlocutory stage of the proceedings, Mr. Pierce has satisfied his burden of proof regarding the occurrence of an injury and the Court concludes that he would likely prevail on the issue at a hearing on the merits.

*Mr. Pierce is entitled to an evaluation by another physician.*

The Workers' Compensation Law states that the employer shall furnish, free of charge to the employee, such medical treatment as ordered by the attending physician made reasonably necessary by accident. Tenn. Code Ann. § 50-6-204(a)(1)(A) (2014). The statute additionally states that any treatment recommended by a physician selected from a panel or by referral, if applicable, "shall be presumed to be medically necessary for treatment of the injured employee." Tenn. Code Ann. § 204(a)(3)(H)(2014).

In this case, the parties stipulated that Mr. Pierce selected Complete Express Care from a panel, whose providers apparently referred him to TOA[4]. Dr. Rungee opined that an FCE is necessary to determine "just what he can or cannot do" (Ex. 1, p. 11). Metro offered no proof to rebut Dr. Rungee's opinion on the need for an FCE. Mr. Pierce testified that, due to a high blood pressure reading when he appeared for the FCE, he must obtain clearance from a family practice physician as a prerequisite to undergo the FCE, and that the carrier declined to authorize such clearance. Metro offered no contrary proof.

It is well established in Tennessee Workers' Compensation Law that an employer takes an employee as he finds him. *See Coleman v. Coker*, 321 S.W.2d 540, 541 (Tenn. 1959). While Mr. Pierce's hypertension is not a part of the compensable claim, medical clearance for the condition is essential to completion of the FCE and without it, his claim is stalled.

In *Rogers v. Shaw*, 813 S.W.2d 397 (Tenn. 1991), the Tennessee Supreme Court touched on the issue of treatments unrelated to the workplace accident, but necessary for treatment of the work injury. In *Rogers*, an employee developed lung cancer caused by asbestosis and cigarette smoking. The treating physician determined the asbestosis is related to his work as a pipe fitter. *Id.* at 398. The treating physician determined that he could only cure the cancer by completely removing the employee's left lung. *Id.* In addition to cancer, the employee also had a significant, but non-work-related, arterial blockage. *Id.* The treating physician determined that he could not perform the lung surgery without first performing a coronary bypass. *Id.* Unfortunately, the employee suffered a stroke during the bypass surgery and died several weeks later. *Id.* The trial court denied the death claim brought by the employee's widow. *Id.* at 399. She appealed the decision. Although the stroke occurred during surgery of a non-work related condition, the Supreme Court reversed the trial court's decision. *Id.* at 400. The Court reasoned that because the bypass surgery was a prerequisite to removing the lung, "the bypass surgery was reasonably required to treat the occupational disease, the lung cancer." *Id.*

Here, Mr. Pierce needs a medical release concerning his hypertension so that he can complete an FCE. Although the condition is not directly related to his work-related arm and back injuries, it cannot be forgotten that Mr. Pierce would not need an FCE but for the work-related accident. Furthermore, Dr. Rungee is unable to place Mr. Pierce at Maximum Medical Improvement until Mr. Pierce completes the FCE so that he can determine whether to impose permanent restrictions. Under these circumstances, the Court finds that the medical release is reasonably required for provision of the FCE. This shall be accomplished by Metro providing Mr. Pierce a panel of appropriate physicians to evaluate his fitness to participate in an FCE despite his hypertension.

---

[4] The Complete Express Care records do not indicate that providers there made the referral, but the case manager's presence at the TOA appointment suggests that is the case.

*Mr. Pierce is entitled to past and future temporary partial disability benefits.*

As an initial matter, with regard to the issues presented in this case, this Court is mindful of the requirement of Tennessee Code Annotated section 50-6-239(b)(1) that, "unless permission has been granted by the assigned workers' compensation judge," only issues that have been certified by the mediator within a DCN may be presented to a judge for adjudication; *see also, LaToya Dorsey v. Amazon.com, Inc.,* No. 2015-01-0017 (Tenn. Work. Comp. Bd., May 14, 2015). The DCN in this matter lists Mr. Pierce's entitlement to temporary *total* disability benefits, rather than temporary *partial* disability benefits. For the following reasons, the Court finds it appropriate to rule upon the issue at this time.

At the hearing, the parties agreed that Mr. Pierce's entitlement to "past or future temporary total disability benefits *or temporary benefits*" was an issue for adjudication (emphasis added). Metro's Counsel did not object on the basis that it had no knowledge that Mr. Pierce seeks temporary partial disability benefits. In fact, Metro's Counsel acknowledged that temporary partial disability benefits is the type of benefit appropriate under the circumstances when Counsel contended in closing arguments that Mr. Pierce is ineligible for them. Mr. Pierce is self-represented and may or may not be familiar with the distinction between temporary total disability benefits versus temporary partial disability benefits. This Court holds him to the standards of an attorney; however, in this Court's experience, even seasoned lawyers occasionally misunderstand the distinction between the two types of temporary disability benefits. Further, at the time of the issuance of the DCN, neither party was represented by counsel. The Court finds that the parties did not have knowledge of the nuanced difference between temporary total and partial disability at that time and they could not have known of the issue despite reasonable investigation. *See* Tenn. Code Ann. § 50-6-239(b)(2)(A) (2014). The Court additionally finds that prohibiting presentation of the issue would result in substantial injustice to the petitioning party, in light of the parties' stipulation that Mr. Pierce has not worked since October 10, 2014, and Mr. Pierce's testimony that he is experiencing financial hardship. *See* Tenn. Code Ann. § 50-6-239(b)(1)(B). At the Expedited Hearing, both parties were fully heard on the issue. Neither party is prejudiced by the Court's clarification on the record of, and the parties' agreement to, the type of temporary disability benefit Mr. Pierce sought. The Court finds adequate grounds to grant permission to the parties to present the temporary partial disability issue to the Court.

Addressing temporary partial disability benefits, the Workers' Compensation Law provides that, "In all cases of temporary partial disability, the compensation shall be sixty-six and two-thirds percent (66 2/3 %) of the difference between the average weekly wage of the worker at the time of the injury and the wage the worker is able to earn in the worker's partially disabled condition." Tenn. Code Ann. § 50-6-207(2)(A) (2014). An employee is entitled to receive temporary partial disability benefits, pursuant to Tennessee Code Annotated section 50-6-207(2) (2014), when "the temporary disability is not total." *Stem v.*

9

*Thompson Servs.*, No. M2010-01566-WC-R3-WC, 2011 Tenn. LEXIS 742, 27 (Tenn. Workers' Comp. Panel, July 26, 2011).

An injured employee is not entitled to temporary disability benefits if terminated for cause and the employer was reasonably capable of providing modified duty within the restrictions assigned. An employer should be permitted to enforce workplace rules without being penalized in a workers' compensation case. *Carter v. First Source Furniture Group*, 92 S.W.3d 367, 368, (Tenn. 2002). Entitlement to temporary disability benefits requires proof that the employee's inability to work is related to a compensable injury, and concludes when the injured employee reaches MMI. *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978). *See also, Gray v. Cullom Machine Tool and Dye, Inc.*, 152 S.W.3d 439 (Tenn. 2004); *Gluck Brothers, Inc. v. Coffey*, 431 S.W.2d 756 (Tenn. 1968).

In the present case, Mr. Pierce's inability to work is related to the injury he sustained while working for Metro, which this Court has found compensable at this time. APN Chiu and Dr. Rungee placed restrictions upon Mr. Pierce. Further, Ms. Robinson testified that Metro's policy is to accommodate workers with restrictions and that Metro could have accommodated Mr. Pierce. Mr. Pierce offered no proof to contradict her testimony on that particular point. Thus, the question is whether Metro terminated Mr. Pierce for cause, and, specifically, whether it demonstrated that Mr. Pierce's termination was proper.

The Court finds that Mr. Pierce's termination did not involve a breach of Metro's reasonable expectations and the termination does not appear reasonably appropriate. *See, Carter*, 92 S.W.3d at 371-72.

By Ms. Robinson's testimony, Metro arbitrarily applied its no-call/no-show policy. According to the Metro Industrial Questionnaire (Ex. 2, Attach. 6; Ex. 7), Mr. Pierce "missed" work on September 27 and 28, 2014, a weekend. Ms. Robinson testified that if they were "short-staffed" or "did not have enough numbers," he might not have had to work those two days. She expressly stated that these dates were not significant. Ms. Robinson clearly did not know whether Mr. Pierce worked on those days or not. Similarly, on October 11 and 12, 2014 – also a weekend – it appears that Mr. Pierce did not call in. Ms. Robinson articulated a rather odd "rule": that employees must call in even if they are not scheduled to work. She offered no written documentation verifying or explaining this standard. It was only on cross-examination that Ms. Robinson testified: "I *heard* that that department did work that day. We do have on-sites who tell us when those people work." The Court attaches particular significance to the fact that Ms. Robinson did not offer details regarding her receipt of this information. She failed to convey from whom, when or by what means of communication she received the information and offered no written evidence that Tepro conducted work on Mr. Pierce's line that weekend. The Court views this as pure speculation on her part and as such, finds her testimony to be without credibility on this issue. This is reinforced by a glance at an hours recap for Mr. Pierce

(Ex. 2, Attach. 5), which shows that Mr. Pierce worked only Monday through Friday hours.

Mr. Pierce's testimony that he reported his injury immediately upon its occurrence and that he waited for weeks for Metro to advise how he should proceed is unrefuted and credible. He reported pain related to a work injury on October 10, 2014, the day he left work early. Metro failed to prove that Mr. Pierce missed required work on October 11 and 12, 2014. Hence, the Court concludes that Mr. Pierce's discharge was unreasonable and Mr. Pierce is likely to prevail at a hearing on the merits on this issue.

Metro's counsel argued that longstanding, binding caselaw supports its position regarding the appropriateness of the discharge, but counsel failed to develop this argument by referencing a case presenting similar facts and law. With regard to the case cited by Metro's counsel, *Ricketts v. Dana*, No. 2014-07-0024 (Tenn. Ct. Workers' Comp. Claims, March 23, 2015), this Court notes that a determination regarding the breach of an employer's reasonable expectations and the appearance of reasonable appropriateness requires a highly fact-specific inquiry. In *Ricketts,* the employer terminated the employee for falsification of company documents and for sleeping on the job. In the present case, the termination is based on failure to call in when Metro offered no evidence that Mr. Pierce was required to work on the days relied upon by Metro, except for an "I heard" statement.

In sum, but for the unreasonable discharge, Metro would have provided Mr. Pierce work within his restrictions. Since those restrictions remain the only proof of Mr. Pierce's physical restrictions, Mr. Pierce is entitled to past temporary partial disability benefits from November 7 to November 13, 2014, and December 5, 2014, through the present, a period of one-hundred eighty-eight (188) days, or twenty-seven (27) weeks, in the amount of two-hundred seventy-seven dollars and nine cents ($277.09) per week or thirty-nine dollars and fifty-eight cents ($39.58) per day, for a total of seven thousand four-hundred eighty-one dollars and forty-three cents ($7,481.43). Metro shall continue to pay temporary benefits until Mr. Pierce is placed at MMI or returns to work.

**IT IS, THEREFORE, ORDERED** as follows:

1. Metro, or its Carrier shall provide medical care for Mr. Pierce's injuries as required by Tennessee Code Annotated section 50-6-204, to be initiated by Metro or its carrier providing a panel of physicians for evaluation and treatment of Mr. Pierce's hypertension to enable performance of the FCE. Mr. Pierce or the medical providers shall furnish medical bills to Metro or its carrier for payment.

2. Metro or its carrier shall pay past due temporary benefits in the amount of $7,481.43 for the period of November 7 to November 13, 2014, and December 5, 2014, through June 4, 2015.

11

3. Metro or its workers' compensation insurance carrier shall continue to pay to Mr. Pierce temporary disability benefits in regular intervals until he is no longer eligible for those benefits by reaching Maximum Medical Improvement, by returning to work, or by release without restrictions by the authorized treating physician. Metro's representative shall notify the Division and Mr. Pierce in writing immediately, and by filing a Form C-26, of its intent to terminate temporary disability benefits and citing the basis for said termination.

4. This matter is set for Initial Hearing on **July 15, 2015, at 9:30 a.m.**

5. **Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven (7) business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Division by email to WCCompliance.Program@tn.gov no later than the seventh (7th) business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

6. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED this the 4th day of June, 2015.**

**Kenneth M. Switzer, Chief Judge**
**Court of Workers' Compensation Claims**

Initial Hearing:

An Initial Hearing has been set with **Chief Judge Kenneth M. Switzer, Court of Workers' Compensation Claims. You must dial in at 615-532-9552 or 866-943-0025 toll free to participate in your scheduled conference.**

**Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation.** All conferences are set using Central Time (CT).

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within seven (7) business days* of the date the Expedited Hearing Order was entered by the Workers' Compensation Judge.

3. Serve a copy of the Request for Appeal upon the opposing party.

4. The parties, having the responsibility of ensuring a complete record on appeal, may request from the Court Clerk the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a statement of the evidence within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must be approved by the Judge before the record is submitted to the Clerk of the Appeals Board.

5. If the appellant elects to file a position statement in support of the interlocutory appeal, the appealing party shall file such position statement with the Court Clerk within three (3) business days of the filing of the Expedited Hearing Notice of Appeal, specifying the issues presented for review and including any argument in support thereof. If the appellee elects to file a response in opposition to the interlocutory appeal, appellee shall do so within three (3) business days of the filing of the appellant's position statement.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 4th day of June, 2015.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|---|---|---|---|---|---|---|
| Artie Pierce, Employee | X | | | | X | pierceartie3435@yahoo.com |
| Michael Jones, Employer/Carrier's attorney | | | | | X | mjones@wimberlylawson.com |

Penny Shrum, Clerk
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

14